UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | |
|---|---|
| JEFFREY E. AKARD, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) No. 1:21-cv-02133-JMS-CSW |
| | ) |
| COMMISSIONER OF THE INDIANA | ) |
| DEPARTMENT OF CORRECTION, *et al.*, | ) |
| | ) |
| Defendants. | ) |

**ORDER GRANTING WEXFORD'S MOTION FOR SUMMARY JUDGMENT**

Jeffrey Akard alleges that he was deprived of medication and an accommodation for chronic injuries while incarcerated at in Indiana Department of Correction prisons due to policies or practices of the IDOC's third-party healthcare provider, Wexford of Indiana, LLC. For the following reasons, Wexford's summary judgment motion is **granted**.

**I. Summary Judgment Standard**

A motion for summary judgment asks the Court to find that a trial is unnecessary because there is no genuine dispute as to any material fact and, instead, the movant is entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56(a). When reviewing a motion for summary judgment, the Court views the record and draws all reasonable inferences from it in the light most favorable to the nonmoving party. *Khungar v. Access Cmty. Health Network*, 985 F.3d 565, 572–73 (7th Cir. 2021). It cannot weigh evidence or make credibility determinations on summary judgment because those tasks are left to the fact-finder. *Miller v. Gonzalez*, 761 F.3d 822, 827 (7th Cir. 2014). A court only has to consider the materials cited by the parties, *see* Fed. R. Civ. P. 56(c)(3); it need not

"scour the record" for evidence that might be relevant. *Grant v. Trs. of Indiana Univ.*, 870 F.3d 562, 573−74 (7th Cir. 2017) (cleaned up).

"[A] party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986). "[T]he burden on the moving party may be discharged by 'showing'—that is, pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case." *Id*. at 325.

Whether a party asserts that a fact is undisputed or genuinely disputed, the party must support the asserted fact by citing particular parts of the record, including depositions, documents, or affidavits. Fed. R. Civ. P. 56(c)(1)(A). Failure to properly support a fact in opposition to a movant's factual assertion can result in the movant's fact being considered undisputed, and potentially in the grant of summary judgment. Fed. R. Civ. P. 56(e).

## II. Facts

Wexford is a private company that contracted to provide medical care to all IDOC inmates from July 2018 through June 2021. *See* dkt. 182-1 at ¶ 2. Wexford was responsible for Mr. Akard's medical care during that period, first at Wabash Valley Correctional Facility and then at New Castle Correctional Facility.

This case is based on Mr. Akard's allegations that he suffers from chronic gastroesophageal reflux disease (GERD) and that chronic back and shoulder pain make it difficult for him to climb into an upper bunk. The Court previously found that "Mr. Akard's amended complaint adequately alleges that Wexford . . . policies, practices, or customs caused him not to be prescribed necessary

GERD meds and to be denied a bottom-bunk pass." Dkt. 78 at 7. Based on those allegations, the Court recognized plausible "Eighth Amendment claims of deliberate indifference to serious medical conditions against Wexford." *Id.*

### A.    GERD

In April 2019, Mr. Akard was incarcerated at the IDOC's Reception and Diagnostic Center. Dkt. 218 at 51. A doctor there noted that Mr. Akard had previously been diagnosed with GERD and esophagitis. She prescribed Prilosec. *See id.* at 51–52.

Prilosec, or Omeprazole, is a proton pump inhibitor, which is a class of drug commonly used to manage GERD symptoms. Dkt. 182-1 at ¶¶ 13, 22–23. At some point, Mr. Akard was prescribed Pepcid, also known as Famotidine. *See* dkt. 218 at 35. Pepcid is an H2 blocker, which is another class of drugs commonly used to manage GERD symptoms. Dkt. 182-1 at ¶ 13, 17.

In early 2020, a nationwide surge in demand for Pepcid resulted in a backorder that made it difficult for Wexford to obtain Pepcid from its pharmacy. Dkt. 182-1 at ¶ 17. On March 11, 2020, while incarcerated at Wabash Valley, Mr. Akard met with Dr. Samuel Byrd. Dkt. 182-3 at 4–6. Dr. Byrd noted Mr. Akard's diagnoses of GERD and grade 2 esophagitis. *Id.* at 4. He also noted that Mr. Akard could not obtain Pepcid due to the backorder. *Id.* At Mr. Akard's request, Dr. Byrd prescribed Omeprazole. *Id.* at 4–6.

Mr. Akard and other inmates were notified in writing on March 23, 2020, that Pepcid was no longer available due to the backorder. Dkt. 218 at 35. They were advised to make behavioral changes to limit GERD symptoms, including losing weight, avoiding foods that triggered reflux, and avoiding eating before bed. *Id.* They were also advised that they could obtain antacids and Omeprazole from the commissary and use them to treat his symptoms as needed, "up to a few

times a week." *Id.* They were also advised to limit use of Omeprazole and other proton pump inhibitors due to concerns about side effects with long-term use. *Id.*

In May 2020, Mr. Akard met with Dr. Naveen Rajoli. *Id.* at 1–3. Dr. Rajoli prescribed Carafate, also known as Sucralfate, which is used to treat GERD and ulcers. *Id.*; dkt. 182-1 at ¶ 24.

Mr. Akard met again with Dr. Byrd on June 16, 2020. Dkt. 218 at 56–57. Mr. Akard requested Omeprazole, but Dr. Byrd renewed his Carafate prescription and re-emphasized that Mr. Akard should avoid certain foods and late meals. *Id.* On July 31, 2020, Mr. Akard reported to a nurse that Carafate was not relieving his symptoms. Dkt. 218 at 58.

In December 2020, Mr. Akard was transferred to New Castle. Dkt. 182-2 at 3, 8:4–7. In January and June 2021, Mr. Akard met with a nurse regarding gas and bloating. Dkt. 218 at 61–64. Notes from these visits do not discuss GERD symptoms.

Mr. Akard's final doctor visit under Wexford's care was June 24, 2021. Dkt. 218 at 65–66. According to Dr. John Nwannunu's notes, Mr. Akard reported that his GERD symptoms were stable and adequately relieved by antacids. *Id.* Mr. Akard disputes this. *See id.* at 65 ("Says who?").

In his deposition, Mr. Akard testified that he has "never gone without" medication for GERD. Dkt. 182-2 at 11, 38:5–13. When he was not prescribed GERD medication, he "was able to get it through commissary or other means." *Id.* He cannot go without these medications because, without them, he "will throw up acid" and "cannot sleep." *Id.*

**B.     Bottom Bunk Pass**

Mr. Akard is a U.S. Army veteran. He suffered service-connected injuries to his shoulder and back. The Department of Veterans Affairs rated him as 30% disabled in 2003. Dkt. 218 at 70.

In 2019 at Wabash Valley, Mr. Akard fell from his top bunk and caught himself but aggravated his shoulder injury. *Id.* at 76–77. In November 2019, he reported difficulty getting into

4

and out of his bed during a visit with Dr. Byrd. *Id.* at 82–83. Dr. Byrd did not provide Mr. Akard with a pass that would guarantee him assignment to a bottom bunk.

When Mr. Akard saw Dr. Byrd on March 11, 2020, he asked for help in obtaining a bottom bunk pass. Dkt. 182-3 at 4. Dr. Byrd noted that Mr. Akard's medical records showed some degeneration in his lower spine but also wrote that such injuries were so common "that we simply do not have enough bottom bunks to accommodate all offenders with such an issue." *Id.* Dr. Byrd also considered Mr. Akard's shoulder injury but determined he should be able to climb in and out of bed by placing most of the weight on his stronger shoulder. *Id.* At the time, Mr. Akard was assigned to a lower bunk. *Id.*

In December 2020, Mr. Akard filed a grievance regarding the denial of a bottom bunk pass. Dkt. 218 at 94. His grievance and appeals were denied on grounds that his disabilities were not serious enough to qualify for a bottom bunk pass. *Id.*

At all relevant times, Wexford maintained "standard qualifications" for bottom bunk passes. Dkt. 218 at 5. Standard qualifications for a long-term bottom bunk pass included major joint fusion, seizure disorder, gross obesity, a gross neurological dysfunction, use of a prosthetic limb, or being age 60 or older. *Id.* Standard qualifications for a temporary bottom bunk pass included recovery from a major surgery, fractures or sprains, or a temporary illness. *Id.* There is no dispute that Mr. Akard's conditions did not meet the standard qualifications.

If a doctor examined a patient who did not meet the standard qualifications and nevertheless believed his condition warranted a bottom bunk pass, the doctor could request an exception. Dkt. 182-1 at ¶ 9.

### III. Analysis

Viewed in the light most favorable to Mr. Akard, the record would not allow a reasonable jury to find Wexford responsible for a violation of Mr. Akard's constitutional rights. Before addressing the merits of his claims, however, the Court must resolve two preliminary matters.

First, Mr. Akard's objection to Wexford's untimely reply, dkt. [230], is **sustained**. Wexford filed its reply 21 days after Mr. Akard filed his response—seven days after the deadline imposed by Local Rule 56-1(c). The **clerk is directed** to **strike** Wexford's reply, dkt. [229].

Second, Mr. Akard contends broadly that Wexford has wrongly withheld discovery and that the Court should either deny Wexford's motion or delay its ruling pursuant to Federal Rule of Civil Procedure 56(d). But the Court resolved all pending discovery motions before Mr. Akard responded to Wexford's motion. Moreover, Mr. Akard's broad contention does not state what specific facts are unavailable to him or what material facts would become available if the Court allowed additional discovery. Therefore, his request for relief under Rule 56(d) is **denied**.

**A.    The Eighth Amendment**

The Eighth Amendment's prohibition against cruel and unusual punishment imposes a duty on the states, through the Fourteenth Amendment, "to provide adequate medical care to incarcerated individuals." *Boyce v. Moore*, 314 F.3d 884, 889 (7th Cir. 2002) (citing *Estelle v. Gamble*, 429 U.S. 97, 103 (1976)). "Prison officials can be liable for violating the Eighth Amendment when they display deliberate indifference towards an objectively serious medical need." *Thomas v. Blackard*, 2 F.4th 716, 721–22 (7th Cir. 2021). "Thus, to prevail on a deliberate indifference claim, a plaintiff must show '(1) an objectively serious medical condition to which (2) a state official was deliberately, that is subjectively, indifferent.'" *Johnson v. Dominguez*, 5 F.4th

6

818, 824 (7th Cir. 2021) (quoting *Whiting v. Wexford Health Sources, Inc.*, 839 F.3d 658, 662 (7th Cir. 2016)).

A finding of deliberate indifference requires evidence that the defendant knew of a serious risk to the plaintiff's health but disregarded it. *Petties v. Carter*, 836 F.3d 722, 728 (7th Cir. 2016). Deliberate indifference requires more than negligence or even objective recklessness. *Id*. The plaintiff "must provide evidence that an official actually knew of and disregarded a substantial risk of harm." *Id*. "Of course, medical professionals rarely admit that they deliberately opted against the best course of treatment. So in many cases, deliberate indifference must be inferred from the propriety of their actions." *Dean v. Wexford Health Sources, Inc.*, 18 F.4th 214, 241 (7th Cir. 2021) (internal citations omitted).

The Seventh Circuit has "held that a jury can infer deliberate indifference when a treatment decision is 'so far afield of accepted professional standards as to raise the inference that it was not actually based on a medical judgment.'" *Id.* (quoting *Norfleet v. Webster*, 439 F.3d 392, 396 (7th Cir. 2006)). The Seventh Circuit has also held that deliberate indifference occurs when the defendant:

- refuses "to take instructions from a specialist." *Petties*, 836 F.3d at 729.
- persists "in a course of treatment known to be ineffective." *Id.* at 729–30.
- chooses "an 'easier and less efficacious treatment' without exercising professional judgment." *Id.* at 730 (quoting *Estelle*, 429 U.S. at 104 n.10).
- effects "an inexplicable delay in treatment which serves no penological interest." *Id.*

But where the evidence shows that a decision was based on medical judgment, a jury may not find deliberate indifference, even if other professionals would have handled the situation differently. *Dean*, 18 F.4th at 241–42.

### B. *Monell* and Corporate Liability

"[A] private corporation that has contracted to provide essential government services is subject to at least the same rules that apply to public entities," meaning it may be liable for constitutional violations caused by its policies, practices, and customs. *Glisson v. Indiana Dep't of Corr.*, 849 F.3d 372, 378–79 (7th Cir. 2017) (citing *Monell v. New York City Dep't of Soc. Servs.*, 436 U.S. 658 (1978)). "The central question is always whether an official policy, however expressed . . . , caused the constitutional deprivation." *Id.* at 379. Put otherwise, "is the action about which the plaintiff is complaining one of the institution itself, or is it merely one undertaken by a subordinate actor?" *Id.* at 381.

Proving a *Monell* claim is a "high bar." *Dean*, 18 F.4th at 235 (internal quotation omitted). If the defendant's policy or practice "is not facially unconstitutional, the plaintiff 'must prove that it was obvious that the municipality's action would lead to constitutional violations and that the municipality consciously disregarded those consequences.'" *Id.* (quoting *LaPorta v. City of Chicago*, 988 F.3d 978, 987 (7th Cir. 2021)).

### C. GERD

Viewing the record in the light most favorable to Mr. Akard, a jury could reasonably find that his GERD was a serious medical condition and that he was denied prescription medication that would have relieved his GERD symptoms because Wexford implemented a policy or practice of limiting Omeprazole prescriptions. *See* dkt. 218 at 35. A jury might find that this policy was based on concern over side effects as Wexford's paperwork suggests or that it was motivated by cost savings or profit maximization as Mr. Akard argues in his briefing.

Regardless, there is no basis for finding an Eighth Amendment violation by Wexford. It is fundamental that an entity "cannot be liable under *Monell* when there is no underlying

8

constitutional violation by" one of its employees. *Gaetjens v. City of Loves Park*, 4 F.4th 487, 495 (7th Cir. 2021) (internal quotation omitted). Mr. Akard admits that he has "never gone without" medication for GERD. Dkt. 182-2 at 11, 38:5–13. It is "well established" that "the Eighth Amendment does not compel prison administrators to provide cost-free medical services to inmates who are able to contribute to the cost of their care." *Poole v. Isaacs*, 703 F.3d 1024, 1026–27 (7th Cir. 2012).[1]

There is no dispute that, even after Wexford limited Omeprazole prescriptions, it made medication available through the commissary. There is no dispute that Mr. Akard had constant access to medication and was able to consume it as he needed. Wexford limited Mr. Akard's access to GERD medication, and the wisdom and compassion of its policy may be debatable, but it undeniably did not cause an Eighth Amendment violation.

**D.   Bottom Bunk Pass**

Wexford maintained a written policy regarding eligibility for bottom bunk passes. There is no basis for finding, however, that the policy was facially unconstitutional or that Wexford's policymakers must have known inmates with serious needs for bottom bunk passes would fail to meet the criteria, be denied, and face substantial risks of harm. *See Dean*, 18 F.4th at 235.

Mr. Akard does not dispute Wexford's evidence that physicians had discretion to request an exception when they believed an inmate who did not meet the standard qualifications nevertheless needed a bottom bunk pass. Dkt. 182-1 at ¶ 9. In view of that discretion, there is no basis in the

---

[1] *See also Jones-Bey v. Cohn*, 115 F. Supp. 2d 936, 940 (N.D. Ind. 2000) ("'Co-pay policies under which inmates must bear the cost of their treatment are Constitutionally permissible if they do not interfere with timely and effective treatment of serious medical needs."); *Martin v. DeBruyn*, 880 F. Supp. 610, 615 (N.D. Ind. 1995) (The Eighth Amendment "does not forbid a state from requiring that an inmate pay for his medical treatment to the extent he is able to do so, as he would have to do were he not deprived of his liberty. The Eighth Amendment guarantees only that states will not ignore an inmate's serious medical needs; it does not guarantee free medical care.").

9

record for a jury to find that it "'it was obvious'" to Wexford's policymakers that its policies and practices related to bottom bunk passes "'would lead to constitutional violations.'" *Dean*, 18 F.4th at 235 (quoting *LaPorta v. City of Chicago*, 988 F.3d 978, 987 (7th Cir. 2021)).

In fact, the record shows that Dr. Byrd thoroughly considered whether to issue Mr. Akard needed a bottom bunk pass despite the fact that he did not meet any of the standard qualifications. Dr. Byrd's judgment that Mr. Akard's shoulder injury was too common among the inmate population to warrant a bottom bunk pass and that he could likely get into and out of bed by favoring his strong shoulder may or may not be correct. Regardless, Wexford's policy gave Dr. Byrd discretion to consider a bottom bunk pass for Mr. Akard, and he denied Mr. Akard's request based on his judgment—not as the pre-ordained consequence of Wexford's policy.

## IV.

Mr. Akard's objection to Wexford's untimely reply, dkt. [230], is **sustained**. The **clerk is directed** to **strike** Wexford's reply, dkt. [229].

Wexford's motion for summary judgment, dkt. [180], is **granted**. Claims against Wexford are **dismissed with prejudice**. The **clerk is directed** to **terminate** Wexford as a party on the docket.

**IT IS SO ORDERED.**

Date: 3/15/2024

Hon. Jane Magnus-Stinson, Judge
United States District Court
Southern District of Indiana

Distribution:

JEFFREY E. AKARD
199176
NEW CASTLE – CF
NEW CASTLE CORRECTIONAL FACILITY - Inmate Mail/Parcels
1000 Van Nuys Road
P.O. Box E
NEW CASTLE, IN 47362

Austin Ryan Andreas
Bleeke Dillon Crandall, P.C.
austin@bleekedilloncrandall.com

Carlton Wayne Anker
Lewis and Wilkins LLP
anker@lewisandwilkins.com

Douglass R. Bitner
Stoll Keenon Ogden PLLC
doug.bitner@skofirm.com

Jeb Adam Crandall
BLEEKE DILLON CRANDALL ATTORNEYS
jeb@bleekedilloncrandall.com

Adam Garth Forrest
BBFCS ATTORNEYS
aforrest@bbfcslaw.com

Joseph Thomas Lipps
BBFCS ATTORNEYS
jlipps@bbfcslaw.com

Travis W. Montgomery
Bleeke Dillon Crandall, P.C.
travis@bleekedilloncrandall.com

Eric Ryan Shouse
Lewis And Wilkins LLP
shouse@lewisandwilkins.com

William Dean Young
Lewis And Wilkins LLP
young@lewisandwilkins.com